ALICE M. COLEMAN, Administratrix, Appellant, v. IOWA RAILWAY LIGHT & POWER. COMPANY, Appellee.

PLEADING: Variance—Surplus Allegation in re Negligence. No fatal variance is presented by alleging that a public utility company, in response to a request from deceased for electrical current, (1) erected the poles and strung the wires in the public highway to deceased's residence, (2) installed a transformer in connection with said poles and wires, (3) *owned said poles,*

*wires, and transformer,* and (4) so negligently maintained said electrical appliances as to cause the death of deceased, and by proving the first, second, and fourth allegations and, in lieu of the third allegation, proving that the deceased defrayed the cost of all said appliances; the record failing to show that deceased was charged with any duty to maintain said poles, wires, or transformer.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

### JULY 6, 1920.

### REHEARING DENIED OCTOBER 23, 1920.

ACTION to recover damages for death. Directed verdict for the defendant. Plaintiff appeals. Opinion states the facts.—*Reversed.*

*Samuel A. Anderson, J. E. Holmes,* and *Voris & Haas,* for appellant.

*John A. Reed, William Smyth,* and *Barnes, Chamberlain & Hanzlik,* for appellee.

GAYNOR, J.—This action is brought by the administratrix of the estate of one Charles Coleman. In the action, the plaintiff seeks to recover damages on account of his death, which, she asserts, was caused by the negligent and wrongful acts of the defendant. She charges that the defendant is a corporation, with its principal place of business in Cedar Rapids, Iowa; that, at the time of the accident which resulted in the death of decedent, and for a long time prior thereto, it was engaged in the business of furnishing electricity for light and power to various homes and places of business in the state; that, to effectuate the purpose, it had constructed and was keeping and maintaining poles along the public highways of the state, and kept and maintained electric wires strung upon these poles; that these wires so strung were designed to convey electricity to those who desired it for consumption. The plaintiff re-

cites that a string of poles *belonging to the defendant,* and being a part of the poles above referred to, were set about 150 feet apart in the highway; that one of the poles was placed in front of the residence of deceased, and another about 150 feet to the south; that the defendant, at and prior to said injury, kept, had, and maintained, strung along said poles and extending therefrom for a long distance, two electric wires, known as "high tension" wires, and fastened and hung to and between said poles at a distance of about one foot apart, and parallel with each other; that, during all the time, and particularly at the time of the accident, a current of electricity was carried and permitted by the defendant to pass along and through these two high tension wires, carrying a current of about 2,200 voltage or volts; that it also kept and maintained upon said poles two "service" wires, hung parallel with the high tension wires, hung one on either side of the high tension wires, one towards the deceased's home, one about one foot from the high tension wire, the other on the opposite side of the two high tension wires, about the same distance therefrom; that, on the top of the pole opposite plaintiff's home, an instrument was installed by the defendant company known as a "transformer," built and constructed and designed to permit the taking from the passing current on the high tension wires a certain fixed voltage of electricity into the residence of deceased, for the use of deceased and his family; that connection was so made to and with the transformer as to cause and permit only 110 volts to pass through and along over the service wires into the residence, and into the cellar or basement, there to be connected with appliances so designed as to permit and enable deceased and his family to make use of the electricity; that the deceased had purchased and was using for this purpose, an extension or drop cord, known as an electric cord, equipped with plugs, one of which was designed to be inserted into a receptacle in the basement of the home, and the other end was connected with a washing machine, so that electricity passing through said service wire would be transferred

into and through said washing machine, and afford power for the operation of the same; that this cord was properly strung and maintained.

·The plaintiff further states that, on or about the 27th day of May, 1918, and about half past 1 o'clock in the afternoon. deceased was in the act of carrying said extension or drop cord in the basement; that, in so walking from the basement, he permitted the wire to trail out behind him, holding the wire as it trailed; that, while he was so doing, a tremendous electric shock passed from the said 'wire into his body, causing his death. The plaintiff charges that the two high tension wires and the two service wires were hung between said poles so loosely that, at the central point between the poles upon which the wires were hung, they sagged or hung down at least three feet below the point of attachment on the pole, and were so strung and kept and maintained there that there was at all times present imminent danger that one or both of said wires would be blown or moved by the wind so as to cause one or both of said service wires to come in contact and entangled with and wrapped around the high tension wires, and thus to permit the heavy voltage on the high tension wires to pass along and through both of said service wires into the appliances in deceased's residence; that they not only permitted these wires to be and remain sagged, but so placed and maintained them that they would and did come in contact with certain trees and the limbs of certain trees standing out at that point; that, on account of the blowing and swaying of the limbs of the trees, there was at all times danger and likelihood that the high tension wires and the service wires would be brought together and entangled by the movement of the limbs and by the force of the wind; that it was practicable and feasible for said high tension wires to be so strung, fastened, and located between the poles that they could not and would not come in contact with each other, and would not wrap around each other or entangle; that defendant knew that it was essential and necessary for the reasonable safety and protection of de-

ceased and his family, while engaged in using electricity, that said wires be so strung, kept, and maintained as to prevent their coming in contact with each other, or being wrapped around each other or entangled, and knew that it was extremely dangerous to the deceased and his family to have said wires kept, strung, and maintained so as to permit them to come in contact one with the other, or become entangled and wrapped around each other; that, notwithstanding this, the defendant carelessly, negligently, and wrongfully caused and permitted said wires to be so loosely strung, kept, and maintained as to permit one of said service wires and one of said high tension wires to come in contact with the other, and to become entangled and wrapped around each other, and carelessly and wrongfully failed to have, keep, or maintain said wires in a reasonably safe and proper condition for use, and carelessly, negligently, and wrongfully so strung, located, kept, and maintained said service wires and high tension wires as to permit them to come in contact with the limbs of trees, and failed to warn plaintiff of the dangers incident to the condition there created and maintained; that, on account of the high voltage carried on said high tension wires, reasonable care for the protection of its customers, including the deceased, required that the insulation should be of such thickness and quality and character as to prevent transferring electricity from the high tension wires to the service wires, in case the same, for any reason, became entangled or wrapped around each other, or for any reason came in contact with each other; that the insulation of the high tension wires was insufficient in quantity or thickness or quality to render the same, under such circumstances, reasonably safe or proper for use.

It is the contention of the plaintiff that the death of the deceased was traceable directly to the negligent manner in which the wires were strung, kept, and maintained by the defendant; that, by reason of the manner in which they were strung, kept, and maintained, the service wires came in contact with the high tension wires, thereby throwing

into the service wires the high voltage carried on the high tension wires, and through the service wires into the residence of the plaintiff and into the home of the deceased, causing his death.

The defense was a general denial.

The cause was tried to a jury; and, at the conclusion of the evidence, the court directed a verdict for the defendant; and from this, plaintiff appeals.

The only question submitted to us for determination is whether or not, under the issues tendered by the plaintiff and the evidence offered by her in support of these issues, she made a case for the jury.

At the conclusion of the evidence, the defendant made the following motion for a directed verdict, and rested its right to a directed verdict upon the claims therein made:

(1)   That the testimony shows without conflict that the defendant was not the owner of the line through which plaintiff's decedent received the injuries that caused his death.

(2)   That, upon the issues tendered, there is no competent evidence to support a verdict in plaintiff's favor, if one should be returned by the jury.

(3)   The evidence shows without conflict that the plaintiff's decedent was the owner of the electric line over which the charge of electricity passed that caused the death, and that the defendant was in no way responsible for the negligence, if any, charged in the petition.

The argument here proceeds upon the same ground as that upon which, we take it, the motion was sustained. The motion was sustained generally. We are not informed by this record as to the particular ground upon which the court concluded that the plaintiff had made no case for the jury.

To properly dispose of this contention, it is necessary that we examine the pleadings, to ascertain what the real claim is on which plaintiff bases her right to recover. What is the negligence charged? What is the theory developed by her pleading upon which she bases the defendant's lia-

bility? What facts are alleged showing to the court the negligence upon which liability is predicated? What is it charged that the defendant did, or omitted to do, which, under the law, creates liability? What is the proof offered which tends to sustain the claim of the petition that the defendant did, or omitted to do, something charged against it as actionable negligence?

It seems to be the contention of the defendant that, inasmuch as plaintiff alleged that the defendant was the owner of these wires and poles over which the electricity was conducted into her home, she cannot recover unless she affirmatively proves that these poles and wires were the property of the defendant at the time of the doing, or omitting to do, the things charged as negligence. It will be noted from a recitation of plaintiff's claim that she says that the poles belonged to the defendant; that upon these poles the defendant kept and maintained and strung the electric wires over which it is claimed the electricity was carried, both through the high tension and the service wires. It is claimed that, because the evidence fails to show that these poles belonged to the defendant, because the evidence affirmatively shows that these poles were paid for by the deceased, and that the extension wires that carried the electricity into his home were paid for by the deceased, the plaintiff has failed to establish the gravamen of her complaint. It is assumed that, because of this allegation, her right to recover must depend upon proof of this allegation. It is assumed that the showing is such, touching the ownership of the poles and the service wires connecting the current with the plaintiff's home, that there was no duty on the defendant to construct or maintain the line, and no duty to inspect the line to ascertain whether the current which it was sending into plaintiff's home could be sent with safety to its occupants. It is true that this record shows that the poles were paid for by the deceased. It is true that the record shows that the extension wires that carried the electricity into plaintiff's home were paid for by the deceased. It is true that the transformer referred

to by the plaintiff, though furnished by the defendant, was paid for by the deceased. We may assume this to be a fact; but does this sum up and end the controversy? It appears that the defendant is engaged in furnishing electricity to its consumers throughout the state; that to this end it erected a line of poles along the public highways, and especially a line of poles extending from this city to what is known in the record as the "Country Club," a distance of about a mile and a quarter. It appears that the deceased desired to connect with defendant's plant, for the purpose of securing light and power; that he made written application to the defendant therefor, in substantially these words:

"Feb. 12, 1917.

"The undersigned, C. Coleman, hereby requests the Iowa Railway & Light Company to supply electric lighting services to his premises. The consumer agrees to accept and pay for such service monthly from date service begins at the regular schedule rates charged by the company."

It also appears that it was under this application that the services were rendered. It appears that, at that time, poles had been erected along the public highway between the defendant's plant and the Country Club, and that it was serving the Country Club with electricity; that the Country Club paid the expense of these poles and wires, but that the defendant put them up; that various connections were made to various houses between the defendant's plant and the Country Club; that the defendant built the line of electric poles and wires running from this plaintiff's home to the Country Club; that the electricity was manufactured, furnished, and sent out by the defendant, and it collected from the various consumers, including the Colemans, for the services so rendered; that the road and the line of poles to the Country Club extended north from defendant's plant; that the road that passed deceased's home ran east and west in front of the house; that this east and west road extends to the Country Club; that, upon the application of the plaintiff, hereinbefore set out, the company put up the two poles and strung the two high tension wires to the pole

in front of the Coleman house, and it put them there for the purpose of serving the Coleman place alone; that the company furnished the poles and put them up, but charged the cost to Coleman. The company bought the poles, erected the poles, strung the wires on, but charged this to Coleman. All that Coleman paid for was the material.

The defendant's local manager testified:

"The company bought the poles and brought them out, but charged them to Coleman. The company took the wires out there. Coleman paid for the material. The company built the line in front of the house. Because of the expense, it was charged up to Coleman, and he paid the defendant for it. There were two high tension wires, carrying 2,200 voltage. When we put up these poles for Coleman, we put up a transformer, through which 110 volts were conveyed to the Coleman house. The transformer was adjusted so as to serve Coleman with 110 volts. When Coleman made application for service, our men did the work. There were not any primary wires leading to Coleman's house, at the time he asked for electricity. They had to be put up, and they were put up. We had to put up poles. We had to put up primary wires. We didn't have to put up connecting wires, extending from the poles to the house. He might have had someone else do that. I don't know who did it. In order to run wires from the poles to the house, connection would have to be made with the transformer. Our men put up the transformer."

He was asked this question:

"Did Coleman make any arrangements with the defendant company to do anything for him in putting in the line between his house and the Country Club high tension line, except to furnish him material and to furnish him work or labor to put up the line? A. That is all. He paid the company for doing the work at that time a little over $50."

He further testified:

"When Coleman asked me to furnish electricity in his house, by putting in the application hereinbefore referred to, I put his application on file. That means for our fore-

man to do the work. That means to get the service out there. I supposed that my men proceeded under the application so filed to do whatever was necessary to accomplish the purpose called for by the application. When the application comes in, the foreman takes the application, and is supposed to do the work that is necessary to make the connection. I would not know the details. I know the result. I know what all was done. When this application of Coleman's was put on file, my foreman started to work to bring about the result sought. He would have to get the wires up; he had to put up the transformer; and my foreman did the work. I turned it over to him. The material that was used in building the line between Coleman's house and the Country Club was billed to Coleman from this office."

It is conceded that the poles and lines in front of the home of the deceased, over which the electricity was taken and carried into the home, were in the public highway.

Negligence, to be actionable, involves the failure to discharge some duty to the complaining party, whether that duty be legal or contractual. It is the doing or omitting to do something concerning which he owed a duty, which a reasonably prudent and cautious man would not do or omit to do, under like circumstances. Where a duty to do or not to do exists, and that duty is neglected, and injury results, actionable negligence arises. When one predicates liability on a charge that the party complained of did or omitted to do a particular thing which it was his duty not to do or not to omit to do, and says that the omission results in injury, he cannot recover, unless he affirmatively shows the duty charged and its omission. Or, in other words, he cannot predicate liability upon failure to discharge one duty, and recover on proof of a failure to discharge some other duty, though the other duty may be as binding as the one charged. The proof must correspond to the allegation made, and be confined to the point in issue. This is the basis of the thought upon which the court proceeded, in holding that plaintiff had not made a case. The theory of

the court was evidently that, inasmuch as the plaintiff had alleged that the defendant was the owner of the poles and wires, the duty to erect them and maintain them in a safe condition was only an incident of that ownership, and the defendant could not be liable until it was made affirmatively to appear that the condition existed out of which the duty arose; that the fact alleged was the basis of the duty violated, and, the fact not being true, the duty did not arise, and, there being no duty, it followed logically that there could be no negligence predicated on failure to discharge it.   It is true that the plaintiff alleged ownership, but that is not all that the plaintiff alleged.   She alleged that deceased requested the defendant to furnish the electricity; that the defendant knew at that time that the means by which electricity could be supplied had not been furnished; that it undertook to furnish the means for transporting the electricity to the deceased's home; that it erected the poles and strung the wires; that it did this negligently; that it was its duty not to do this in that way.   All this is charged in the petition.   It did undertake to furnish electricity over the poles and wires as it erected them.   Its duty, then, was to see that the poles and wires were erected in a reasonably safe way for the doing of the act which it undertook to do.   When it undertook to erect these poles and string these wires, and over them to furnish plaintiff the use of this dangerous agency, it assumed a duty to the plaintiff to see that the appliances erected, by which and over which it undertook to furnish him this agency, were in such condition as to make it reasonably safe for him to receive the dangerous agency in his home, and to see that it was furnished to him in such a way as not to unreasonably imperil his safety in receiving the thing.   While the general rule contended for by the defendant is true, that the plaintiff cannot present her case upon one theory, try it upon that theory, and recover upon another theory, it is also true, under our theory of pleading and our practice, that plaintiff is not required to prove every fact alleged by her in her petition, in order to be en-

titled to recover. If the allegations of the pleading are such that it discloses a fair duty neglected, resulting in injury, and the injury is traceable to that failure to discharge that duty, a case is made, notwithstanding the fact that other facts may be alleged out of which other duties might arise, and upon which negligence might be predicated. As said in *Russell v. Holder*, 116 Iowa 188:

"Plaintiff was only bound to prove so much of the matter alleged as was necessary to make out his cause of action."

See, also, *Luttermann v. Romey*, 143 Iowa 233; *Watson v. Mississippi River Power Co.*, 174 Iowa 23. If the plaintiff in her petition has alleged—and we think she did—facts showing a legal duty existing on the part of the defendant company towards her deceased, in the manner of erecting and constructing these poles and wires over which it was intended to furnish her husband with electricity, and that they were negligent in the manner in which they arranged the wires, and this negligence was the proximate cause of his death, she has made out a prima-facie case. *Kanz v. J. Neils Lbr. Co.*, (Minn.) 131 N. W. 643.

We cannot construe this petition to make it appear that the sole contention of the plaintiff was that the defendant was the owner of these poles and wires; that out of this, and this alone, arose the duty to see that they were kept and maintained in reasonably safe condition; and that this failure was the proximate cause of the injury. The allegations of her petition are that the wires were strung loosely by the defendant; strung so loosely that the elements, operating upon them, caused the service wires to come in contact with the high tension wires, and thereby carry a heavy voltage of electricity into the home of the deceased. She further claimed that the defendant carelessly caused and permitted the wires to be so loosely strung, kept, and maintained that they were liable to become entangled with the limbs of the trees through which they passed, and thereby cause danger; and that this did cause the injury complained of. The argument of the defendant proceeds upon the the-

ory that these poles and wires belonged to the deceased; that they were there at his instance and request; that they were there for his use; that he had supervision and control of them; that it was his duty to see that they were not loosely strung, and were kept and maintained so as not to become entangled with the high tension wires; that it was the duty of the deceased to maintain the structure in proper condition.

Even though it be said that the wires and poles belonged to deceased, the defendant undertook to erect them, and to place them in position to give service. When it assumed that work, there was involved in it a duty to see that reasonable care was exercised to place them in such juxtaposition, one with the other, that the evils that all the evidence shows might reasonably be expected to result from the coming in contact, might be avoided, and that the consumer might not be unnecessarily and negligently exposed to the hazard of the thing which the defendant undertook to do. There is nothing in this record that shows that the plaintiff owed any duty to superintend the construction of these wires, or to see that they were kept in reasonably safe condition. That duty all rested on the defendant. It rested because it assumed to perform that duty, and to give the deceased the service for which he had petitioned, and for which he paid.

We do not enter into a consideration of the merits of this case. We think the record presents a fair question for the jury, and we think the court erred in directing a verdict for the defendant. Its action in so doing is, therefore,— *Reversed.*

WEAVER, C. J., LADD and STEVENS, JJ., concur.